26

**BEDER et al.**

v.

**CLEVELAND BROWNS, INC. et al.**

Court of Common Pleas of Ohio,
Cuyahoga County.

No. CV–297862.

Decided July 25, 2001.

*Gary, Naegelle & Theado* and *Joshua R. Cohen,* for plaintiffs.

*Hogan & Hartson, L.L.P., Michael D. Colglazier* and *Mark D. Gately; Messerman & Messerman Co., L.P.A.,* and *Gerald A. Messerman,* for defendants.

Opinion and Ruling on Final Approval of Class Action Settlement

KENNETH R. CALLAHAN, Judge.

On April 4, 2001, the plaintiffs and defendants filed a comprehensive settlement with this court, which was preliminarily approved on April 6, 2001. Following a hearing on May 24, 2001, the parties each submitted motions for final approval of the class action settlement, including affidavits of counsel. In accordance with the discussion below, the court approves the settlement.

## I. Background

On November 6, 1995, the ownership of the old Cleveland Browns (the "Browns") announced that the franchise intended to move from Cleveland, Ohio (to the dismay of its fan base in the surrounding region, whose people, for a generation, had provided significant, and sometimes inordinate, support for the defendants), to Baltimore, Maryland, a city and region with its own hollowed football tradition. The announcement precipitated, among other reactions, a number of lawsuits, notable among them, an action in equity which sought to compel the defendants to specifically perform as a National Football League ("NFL") football team in Cleveland for an additional three years pursuant to certain lease obligations.[1] The instant case represents the last of this cluster of lawsuits.

The claims between the parties in the present class action suit have been distilled, by judicial action, trial and appellate court (see, *e.g.*, *Beder v. Cleveland Browns, Inc.* [1998], 129 Ohio App.3d 188, 717 N.E.2d 716), as well as by agreement of counsel, to one central claim: that the move of the franchise breached an implied contract, depriving the class of a right of first refusal that plaintiff asserts was implicit in the ticket purchase.

## II. Settlement Procedure

### A. *Preliminary approval*

On April 6, 2001, a hearing was held on the record in open court, where the parties sought preliminary approval of the proposed settlement. The court granted said motion and set a hearing date to determine whether to give final approval to the parties' proposed settlement.

---

1. The resolution of the action seeking specific performance resulted, after preliminary injunctive relief was obtained, in new team ownership and the creation of a new football stadium for the city of Cleveland.

### B. *Notice of proposed settlement*

Pursuant to the court order of April 6, 2001, the parties sent class members notice of the court's preliminary approval of the settlement before April 11, 2001. In compliance with the court's order, the parties also published the judgment entry on three consecutive Mondays and Thursdays in the Cleveland Plain Dealer, and Akron Beacon Journal, the Lake County News Herald, the Lorain Journal, the Columbus Dispatch, the Youngstown Vindicator, and the Toledo Blade. This notification, both by specific mailing, and regional publication, is sufficient.

### C. *Request for final approval*

On May 24, 2001, again in open court, a hearing was held, during which both parties urged the court to accept the preliminary settlement. None of the class of approximately 11,000 individuals objected.

## III. Requirements for Class Action Settlement

Civ.R. 23(E) provides the requirements for the dismissal or compromise of class action and states:

"Class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

Newberg on Class Actions is the frequently consulted authority on class litigation. In the treatise, the text describes general criteria that courts have employed for settlement approval as follows:

"The criteria generally utilized in determining whether a settlement is fair, reasonable, and adequate are:

"1. Likelihood of recovery, or likelihood of success

"2. Amount and nature of discovery or evidence

"3. Settlement terms and conditions

"4. Recommendation and experience of counsel

"5. Future expense and likely duration of litigation

"6. Recommendation of neutral parties, if any

"7. Number of objectors and nature of objections

"8. The presence of good faith and the absence of collusion[.]" 2 Newberg on Class Actions (3 Ed.1992) 11–97, Section 11:43.

What follows is a brief application of these criteria.

(1) *The likelihood of ultimate success on the merits balanced against the relief offered by the proposed settlement agreement.*

Trial of this matter offered the certainty of serious procedural and factual challenges to the plaintiffs in this action. A nonexhaustive list of those obstacles include a pretrial attack on the certification of the class; an interlocutory appeal by the defendants in the event of an order denying decertification of the provisional class; a challenge of proper trial venue; and, in the event of a favorable jury result, the probability of years of appellate review. Such review, particularly in areas of first impression, would clearly portend results impossible to anticipate[2] with certitude.

Moreover, the plaintiffs, to prevail at trial would have had to create, and benefit from, facially equivocal factfinder inferences, including that their existed terms and conditions that the class and the defendants implicitly contracted for in purchasing season tickets, that an unspoken component of the bargain itself was the right of first refusal, and that the value of the right was significant.

The plaintiffs' definition of the right of first refusal was outlined in this court's prior ruling and is briefly revisited here. The right of first refusal rewards loyal patrons with the opportunity to retain their seating assignment in the stadium the following year, thereby providing security to the patron regardless of how great the demand for tickets is the following year. The right of first refusal also provides the patron with the ability to improve his seat, over his seat location from the prior season, by way of allowing the patron to maintain his seniority in the hopes that another season ticket holder will not renew his tickets and thus enable him to move forward within the stadium. The plaintiffs contend that the defendants offered the right of first refusal and that it was therefore one of the reasons why fans purchased their 1995 season tickets.

The court notes that the plaintiffs survived defendants' motion for summary judgment on the implied contract claim regarding the right of first refusal. Both parties had retained experts in order to determine the actual damages that the class members would be entitled to as a result of their loss of the right of first refusal. Plaintiffs' expert valued the class members' loss at $6,449,942. The dollar amount that the defendants' expert placed on the loss of the plaintiffs' right of first refusal was zero. (It should be noted here that the defendants' expert did concede that if the court were to adopt the plaintiffs' expert's *process* of valuing the loss of the right of first refusal, the figure would be somewhere around $1.2 million.)

In ruling on the implied contract claim regarding the right of first refusal, this court held that the experts' calculations as to the value of the benefit of the right

---

2. Indeed, of the several trial and appellate courts in different Ohio districts that have considered issues relating to the purported rights of ticket holders due to the Browns' departure, each have reached different results.

of first refusal are vastly different and that, in itself, presents a question of fact that must be evaluated by a jury.

### (2) *The complexity, expense, and likely duration of the litigation*

A trial date in this case was set for March 19, 2001, sixty-four months after the ownership of the Browns announced that the franchise would ·be moved to another location. Prior to the commencement of trial, the court would have to address the pending motions before it, including defendants' motions for a change of venue and to remove the provisional class certification. In defendants' motion for final approval of the proposed settlement, the defendants are very candid in addressing the pending motions. The defendants state that if this court were to deny the motion to remove the provisional class certification, the defendants would have automatically appealed the denial pursuant to R.C. 2505.02(B)(5) and, in doing so, would have caused further delay to the actual starting date of the trial.

Additional appellate review of the issues herein would both exacerbate the existing uncertainty and be counterproductive to both parties and only add further financial and emotional sacrifices to an already costly and emotive endeavor.

### (3) *The stage of the proceedings*

On the invitation of the court, the parties entered serious settlement discussions immediately following this court's denial of the defendant's motion for summary judgment. At that point of the proceedings (on or about February 28, 2001), all of the discovery had been completed, and each party had submitted the reports of their experts. Notwithstanding the above-mentioned pending motions, the matter had been fully litigated, briefed, and was trial ready.

### (4) *The opinion of class counsel*

Plaintiffs' class is represented by Joshua R. Cohen, who has zealously represented the class, both in the courtroom, and elsewhere, throughout the five and one-half years of this case. Cohen works exclusively in the field of commercial litigation and is an experienced class action lawyer. The defendants have been represented variously by the estimable law firm of Jones, Day, Reavis & Pogue, and, more recently, by Hogan & Hartson, L.L.P., and in the person of Gerald A. Messerman, the renowned local litigator.

All parties have been extraordinarily well served by counsel.

### (5) *The negotiation process*

As expressed above, negotiations, whether in the personage for former federal Judge William Webster, in court chambers, or on the initiative of the parties, have been intensive, protracted, and creative. They have been conducted in New

York and Washington, D.C., and involved persons throughout the country. These discussions have always been conducted at arm's length. The court finds that the negotiations process in this case to be entirely consistent both with the adversary and resolution traditions of the profession.

### (6) *Objections raised by class members*

No class member has objected to the settlement.[3]

### (7) *The public interest*

Perhaps the most compelling aspect of the settlement proposed before the court is its charitable component. The court record of this matter reflects that the announcement of the departure of the Browns was an historical moment of extraordinary public *pathos* to the city of Cleveland and its surrounding region. Indeed, one would be hard put to cite, eliminating outbreaks of war, parallel examples of the public anger that would exceed that expressed in the fall of 1995.

The settlement agreement provides each class member with a $50 payment. The settlement contains a charitable component, which allows each class member to donate the $50 payment to a charitable fund that was created solely for the purposes of this settlement, which will be administered by United Way Services of Greater Cleveland. The purpose of the charitable fund is to support youth football, youth recreation, and youth well-being in Northeast Ohio.

The art of the law is to produce an ineffable condition: justice. Justice corrects injustice. Out of the inchoate sense of injustice that has been expressed through the many lawsuits that have been filed since the Browns' departure in November 1995, many persons, lawyers and litigants, have struggled, imperfectly, but with some success, to define rights and duties, to fashion remedies, to build anew.

In the case at bar, it is the hope of the parties, and of the court, that the creation of a significant charitable fund that benefits children will, in a way more meaningful than payment to individual class members, alleviate the residual sense of injustice this chapter of local history has produced.

### IV. Conclusion

For these reasons, the proposed settlement is hereby approved as amended.

*So ordered.*

---

3. Only one objection has been raised since this court preliminarily approved the settlement of this action on April 4, 2001. The objector was not a member of the class as he opted out of the lawsuit on April 28, 1999. Under Civ.R. 23(E), nonclass members lack standing to object to a proposed settlement. See *Sutherland v. ITT Residential Capital Corp.* (1997), 122 Ohio App.3d 526, 536, 702 N.E.2d 436, 443.